# IN THE SUPREME COURT OF IOWA

No. 07–0870

Filed November 24, 2010

**KENT A. SIMMONS,**

Appellant,

vs.

**STATE PUBLIC DEFENDER,**

Appellee.

---

Appeal from the Iowa District Court for Scott County, David H. Sivright, Jr., Judge.

An attorney appeals from an order by the district court affirming a decision by the state public defender to limit fees for representing indigent defendants on appeal to $1500. **REVERSED AND REMANDED.**

Kent A. Simmons, Davenport, pro se.

Mark C. Smith, State Appellate Defender, for appellee.

**APPEL, Justice.**

In this case, we are asked to review determinations by the state public defender rejecting the payment of fees to a court-appointed appellate counsel in excess of $1500. In the underlying criminal cases, appellate counsel successfully obtained reversal of the criminal convictions on the ground that the defendants were provided ineffective assistance of counsel at trial. In response to a fee application in each case, the state public defender determined that under his administrative rules, counsel was not entitled to compensation in excess of $1500 per appeal.

The district court affirmed the decisions of the state public defender, largely based upon the existence of a rule limiting compensation to $1500 per appeal except in cases that are so unusual and factually or legally complex as to be "beyond the purview of both the attorney and the state public defender." *See* Iowa Admin. Code r. 493— 12.5 (2006).[1] For the reasons expressed below, we reverse the decision of the district court and remand the case to the district court for further proceedings.

### I. Factual and Procedural History.

**A. Nature of the Underlying Cases.** The fee applications in these cases arise out of challenges to convictions based on ineffective assistance of counsel. In both cases, attorney Kent Simmons was appointed by the court to represent defendants in their appeals—one involving a postconviction relief proceeding and the other involving a direct appeal. The result in both cases was the reversal of convictions

---

[1]All citations to the Iowa Administrative Code refer to the 2006 version unless otherwise provided.

carrying lengthy prison terms and the grant of new trials for the defendants.

In the first case, *Millam v. State*, 745 N.W.2d 719, 721 (Iowa 2008), Millam was convicted of two counts of sexual abuse. His original appeal was dismissed as frivolous under Iowa Rule of Appellate Procedure 6.104 (now rule 6.1005). *Millam*, 745 N.W.2d at 721. Millam filed an application for postconviction relief, asserting that his trial counsel provided ineffective assistance of counsel by failing to present evidence of a victim's prior false accusation of sexual abuse. *Id.* The district court granted the application for postconviction relief, but was reversed by the court of appeals. *Id.* We granted further review, vacated the decision of the court of appeals, affirmed the judgment of the district court, and remanded the case for a new trial. *Id.* at 724.

In the second case, *State v. Cromer*, 765 N.W.2d 1, 5 (Iowa 2009), Cromer was convicted of third-degree sexual abuse. On direct appeal, the defendant claimed that trial counsel provided ineffective assistance of counsel because of trial counsel's failure to object to the admission of a tape-recorded conversation between the defendant and the victim. *Cromer*, 765 N.W.2d at 6. The court of appeals affirmed the conviction. *Id.* On further review, this court vacated the court of appeals decision, reversed the district court judgment, and remanded the case for a new trial. *Id.* at 12.

**B. Statutory, Regulatory, and Contractual Context of Indigent Representation.** Iowa Code section 13B.4(3) (2007) authorizes the state public defender to contract with private attorneys to provide services to indigent persons. The state public defender is directed to establish "fee limitations" for particular categories of cases. Iowa Code § 13B.4(4)(*a*).

The fee limitations are to be reviewed at least every three years. *Id.* In establishing the fee limitations, the state public defender is directed to:

> consider public input during the establishment and review process, and any available information regarding ordinary and customary charges for like services; the number of cases in which legal services to indigents are anticipated; the seriousness of the charge; an appropriate allocation of resources among the types of cases; experience with existing hourly rates, claims, and fee limitations; and any other factors determined to be relevant.

*Id.* The state public defender is required to adopt rules to implement the chapter. *Id.* § 13B.4(8).

The administrative rule adopted by the state public defender is found at Iowa Administrative Code rule 493—12.5. At the time of the applications for fees in this case, the administrative rule provided that fees for appeals for contract attorneys were limited to a cap of $1500, with $1000 payable on the filing of a proof brief and the balance upon the filing of the final brief. Iowa Admin. Code r. 493—12.5. The cap on fees, however, was subject to the following exception:[2]

> **12.5(4)**. *Unusually complicated cases.* In an appeal that is unusually complicated, the attorney may negotiate with the state public defender for a fee in excess of the fees contained in rule 12.5 (13B, 815). However, this rule does not require that the state public defender agree to a higher fee in any particular case. The term "unusually complicated" as used in this rule means that the case is highly exceptional and complex from a legal or factual perspective *and so atypical as to be beyond the purview of both the attorney and the state public defender*. A case is not considered unusually complicated merely because the client is difficult to work

---

[2]The provision of the administrative code establishing an exception to the fee cap has since been amended to allow additional fees in cases that are "highly exceptional and complex from a legal or factual perspective" without the requirement that a case be "so atypical as to be beyond the purview of both the attorney and the state public defender." *See* Iowa Admin. Code r. 493—12.5(4) (2010). In addition, the permissible fee on appeal has been increased to $1800 for each appellate case, with $1200 payable upon filing of the proof brief. *Id.* r. 493—12.5 (2010). The remainder is paid after the final brief is filed.

with or because the case took longer than the attorney anticipated. A case in which an application for further review is filed or a case in which oral argument is held at a location other than Des Moines is generally deemed to be "atypical" as that term is used in the rule.

Iowa Admin. Code r. 493—12.5(4) (emphasis added).

In both cases, Simmons entered into a fee contract with the state public defender. Among other things, paragraph three of the contract provided that the contractor would be paid "for reasonable and necessary legal services performed by the Contractor under this Contract, pursuant to administrative rule adopted by the State Public Defender."

Iowa Code section 13B.4(4)(*d*) provides an avenue for judicial review of the action of the state public defender on a fee application. According to this provision of the Code, "[n]otwithstanding chapter 17A," an action for judicial review may be filed with the district court by motion with the court having jurisdiction over the original appointment. Iowa Code § 13B.4(4)(*d*). "If a claim or portion of a claim is denied, the action of the state public defender shall be affirmed unless the action conflicts with a statute or an administrative rule." *Id.* § 13B.4(4)(*d*)(5). "If a claim is reduced for being excessive, the claimant shall have the burden to establish by a preponderance of the evidence that the amount of compensation and expenses is reasonable and necessary." *Id.* § 13B.4(4)(*d*)(6).

**C. Procedural Background**. On September 27, 2006, Simmons filed fee claims in each case after filing his opening page proof brief as permitted by the administrative rule. In *Millam*, counsel filed a claim for a first installment of $3980. In *Cromer*, counsel filed a claim for a first installment of $4040. In response to the claims, the state public defender cited the terms of the fee contract, noting that only $1000 was due at the filing of the proof brief and that the claims were approved only

in this reduced amount. Simmons appealed both decisions to the district court.

The district court consolidated the appeals for hearing only. At the original hearing, the court adjourned the proceedings to allow further discussions between Simmons and the state public defender regarding whether Simmons was entitled to compensation in excess of the fee cap because the cases were unusually complicated. The state public defender determined that because Simmons conceded in his district court pleadings that he was not entitled to additional compensation under the "unusually complicated" exception to the flat fee, the state public defender could not grant him additional compensation. Nonetheless, the state public defender offered Simmons an additional $2500 to settle the cases, an offer Simmons rejected.

As a result of the lack of resolution, the matter was heard again by the district court. Simmons presented evidence including billing statements, excerpts from his fee contracts with the state public defender, commentary by past Iowa State Bar Association President Alan Fredregill on the inadequacy of fees paid to appointed counsel, a survey of the Iowa State Bar Association indicating the average overhead per lawyer for most Iowa attorneys exceeds $40 per hour, and an affidavit from a criminal law attorney offering her opinion that the fees in both cases were reasonable and necessary and stating her unwillingness to work as a contract attorney in light of the fee cap. Simmons also presented copies of various pleadings and correspondence with the state public defender. Simmons pointed out that if the decision of the state public defender stood, he would be compensated at a rate of less than $12 per hour for services that were necessary and reasonable on behalf

of his client. With overhead costs of the average lawyer approaching $40 per hour, Simmons, in effect, was working for free.

Simmons also filed a written professional statement. Simmons stated that brief writing was "a time-consuming, arduous task." He recalled seminars he attended where former justices of this court emphasized the importance of selectively analyzing cases and writing law and facts as a seamless web. All this, according to Simmons, takes time, even in a case that cannot be characterized as "atypical." The rule, according to Simmons, is "Prepare. Prepare. Prepare."

The district court upheld the decision of the state public defender. According to the district court, the flat-fee limitations in the administrative rules were valid and not contrary to the statute. On the constitutional question of whether the flat fee violated an indigent client's right to counsel, the district court, citing *United States v. Dillon*, 346 F.2d 633 (9th Cir. 1965), held that an attorney has an obligation to represent indigents in criminal cases without payment of a fee, except as may be provided by statute.

On appeal, Simmons raises three interrelated claims. First, Simmons claims that the administrative rule, which the state public defender seeks to enforce, fails to carry out the legislature's mandate for providing reasonable fees for reasonable and necessary services and, as a result, is unenforceable. Second, Simmons argues that the flat-fee rule cannot be enforced because it is null and void on its face, or, in the alternative, because it violates the enabling statutes as applied to the two appeals. Finally, Simmons argues that the fee cap has a chilling effect on the constitutional and statutory rights to effective assistance of counsel.

**II. Standard of Review.**

Our review of a decision by the district court reviewing the state public defender's denial of a claim for attorney's fees is for correction of errors at law. Iowa R. App. P. 6.907. To the extent a claim on appeal involves constitutional issues, our review is de novo. *Lewis v. Iowa Dist. Ct.*, 555 N.W.2d 216, 218 (Iowa 1996).

**III. Overview of the State's Obligation to Provide Effective Assistance of Counsel.**

**A. Relationship Between Statutory and Constitutional Issues.** In this case, Simmons raises both constitutional and statutory issues. Ordinarily, we look to statutory issues first in order to avoid unnecessary constitutional questions. *State v. Fuhrmann*, 261 N.W.2d 475, 477 n.1 (Iowa 1978).

Looking solely at the language of the various statutory provisions, this appeal appears to present a straightforward question. The statute authorizes the state public defender to establish fee limitations for certain categories of cases. Iowa Code § 13B.4(4)(*a*). Acting pursuant to this statutory authority, the state public defender established fee limitations by promulgating Iowa Administrative Code rule 493—12.5. The state public defender then entered into contracts with Simmons that incorporated the fee limitations. *See id.* § 13B.4(3) (permitting the state public defender to contract with "persons admitted to practice law in this state"). Chapter 13B further provides that the state public defender has the authority to deny claims "not payable" under the contract and that any such denial shall be affirmed on review unless it "conflicts with a statute or an administrative rule." *Id.* §§ 13B.4(4)(*c*)(2)(c), .4(4)(*d*)(5).

The question, however, is more complicated. While we often decide cases on statutory grounds to avoid constitutional infirmities, a corollary

of this rule is the notion that our interpretation of statutes is often powered by our desire to avoid the constitutional problem. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Visser*, 629 N.W.2d 376, 380 (Iowa 2001); *see also State v. White*, 545 N.W.2d 552, 557 (Iowa 1996). If fairly possible, a statute will be construed to avoid doubt as to constitutionality. *Thompson v. Joint Drainage Dist. No. 3-11*, 259 Iowa 462, 468, 143 N.W.2d 326, 330 (1966); *Jacobs v. Miller*, 253 Iowa 213, 218, 111 N.W.2d 673, 676 (1961).

As a result, the scope of the constitutional right to counsel provided to indigent defendants under the state and federal constitutions is intertwined and tends to merge with our interpretation of chapter 13B. Even though we prefer to decide cases on statutory rather than constitutional grounds, in this case we must have a firm understanding of the constitutional icebergs that must be avoided in order to guide us in our statutory interpretation. Only if the statute can bear no reasonable construction that avoids constitutional doubt do we proceed definitively to decide the constitutional issue. *See Thompson*, 259 Iowa at 468, 143 N.W.2d at 330; *Miller*, 253 Iowa at 218, 111 N.W.2d at 676.

In this case, it is therefore necessary to review the right to counsel under the United States and Iowa Constitutions. We then turn to the proper interpretation of the statutes involved in this case implementing the right to counsel, giving due consideration to the constitutional contours present in this case. Only if the statute cannot bear a constitutional construction do we consider the merits of the constitutional issues.

**B. Critical Nature of the Right to Counsel in the Constitutional Scheme.** The right to counsel embraced in the Sixth Amendment to the United States Constitution and article I, section 10 of

the Iowa Constitution are not constitutional appendices. As noted by the United States Supreme Court, "there is no right more essential than the right to assistance of counsel." *Lakeside v. Oregon*, 435 U.S. 333, 341, 98 S. Ct. 1091, 1096, 55 L. Ed. 2d 319, 326 (1978). This theme has been reprised by scholarship on this issue:

> Without a lawyer's aid, it is quite unlikely that an accused will be able to enjoy the advantages of the other enumerated rights. Without counsel, there is little chance for a fair battle between equally able adversaries. Counsel's most basic role is to ensure that the confrontation between opponents contemplated by our Constitution actually does take place.

James J. Tomkovicz, *The Right to the Assistance of Counsel: A Reference Guide to the United States Constitution* 128 (Jack Stark ed. 2002).

The critical importance of the right to counsel is demonstrated by two well-accepted legal doctrines. First, all defendants are entitled not simply to counsel, but to *effective* assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S. Ct. 1708, 1716, 64 L. Ed. 2d 333, 343–44 (1980); *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14, 25 L. Ed. 2d 763, 773 n.14 (1970); *Powell v. Alabama*, 287 U.S. 45, 71, 53 S. Ct. 55, 65, 77 L. Ed. 158, 171–72 (1932). Form does not prevail over substance. While criminal defendants are not entitled to perfect counsel, they are entitled to a real, zealous advocate who will fiercely seek to protect their interests within the bounds of the law.

Second, if a person is indigent, the state has the constitutional obligation to provide an effective lawyer at state expense. In Iowa, this basic premise was recognized years ago in *Hall v. Washington County*, 2 Greene 473, 478–79 (Iowa 1850). In this case, we held that a lawyer appointed pursuant to statute was entitled to compensation, even though the statute did not authorize compensation, in order to ensure

that "the arm of the law will [not] be too short to accomplish its designs." *Hall*, 2 Greene at 476. The United States Supreme Court came to essentially the same conclusion regarding the right to counsel more than one hundred years later in *Gideon v. Wainwright*, 372 U.S. 335, 343–45, 83 S. Ct. 792, 796–97, 9 L. Ed. 2d 799, 804–06 (1963).

Substantively, what is expected of appellate counsel in order to be effective has been considered by the United States Supreme Court in a handful of cases. The Supreme Court has emphasized that in performing appellate functions, counsel must be more than a showpiece or amicus curiae, but a real advocate. *Ellis v. United States*, 356 U.S. 674, 675, 78 S. Ct. 974, 975, 2 L. Ed. 2d 1060, 1061 (1958). Appellate counsel must examine the record to determine what potential errors are preserved for appeal. *Anders v. California*, 386 U.S. 738, 742–44, 87 S. Ct. 1396, 1399–1400, 18 L. Ed. 2d 493, 497–98 (1967). Once counsel has determined the potential issues, counsel must conduct adequate research to determine which issues to press on appeal. *McCoy v. Ct. of Appeals of Wis.*, 486 U.S. 429, 438–39, 108 S. Ct. 1895, 1902, 100 L. Ed. 2d 440, 453–54 (1988). In most cases, counsel must consult with his client regarding his right to appeal and the potential grounds for appeal. *Roe v. Flores-Ortega*, 528 U.S. 470, 479–80, 120 S. Ct. 1029, 1035–36, 145 L. Ed. 2d 985, 997 (2000). Counsel must comply with all local rules to ensure that the appeal is heard. *Evitts v. Lucey*, 469 U.S. 387, 396–97, 105 S. Ct. 830, 836–37, 83 L. Ed. 2d 821, 830 (1985). These cases, of course, do not present the entirety of the right to counsel, but are simply markers delineating the scope of the right in specific contexts.

**C. Distinction Between Postconviction and Systemic Claims Involving the Right to Counsel.** The most familiar avenue for enforcement of the right to effective assistance of counsel is through a

postconviction challenge to an underlying conviction. In considering a postconviction challenge to a criminal conviction under the Sixth Amendment, it is clear that not every claim of ineffective assistance, even a meritorious one, requires *reversal of a criminal conviction.* Under *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984), the United States Supreme Court held that before a conviction could be reversed, the defendant needed to show both that counsel's performance was "deficient," and that the deficiency caused actual prejudice. The performance of counsel is deficient if it falls "below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688, 104 S. Ct. at 2064–65, 80 L. Ed. 2d at 693–94. In determining whether the acts or omissions of counsel were constitutionally deficient under *Strickland,* strong deference must be provided to choices of counsel that might, with the benefit of hindsight, appear questionable. *Id.* at 689–90, 104 S. Ct. at 2065–66, 80 L. Ed. 2d at 694–95. In order to meet the prejudice prong under *Strickland,* a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.

Because the relief sought was reversal of the accused's conviction and sentence, the application of the *Strickland* test is necessarily case specific. The Supreme Court has held that the *Strickland* approach applies in determining whether to overturn a conviction due to a violation of the right to appellate counsel as well as trial counsel.[3] *Smith v.*

---

[3]In a number of cases, we have applied the *Strickland* test in determining whether a conviction may be reversed on grounds of ineffective assistance of counsel. *See, e.g., State v. Canal,* 773 N.W.2d 528, 532 (Iowa 2009); *Anfinson v. State,* 758 N.W.2d 496, 499–505 (Iowa 2008); *State v. Schaer,* 757 N.W.2d 630, 637–38 (Iowa 2008). In many of these cases, it appears that the parties made no distinction between the Iowa Constitution and the United States Constitution. *See Canal,* 773 N.W.2d at

*Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed. 2d 756, 780 (2000).

There is, however, a second potential avenue for enforcement of the right to counsel. This second avenue is based on the notion that in order to ensure effective assistance of counsel for indigent defendants, the state has an affirmative obligation to establish a system of indigent defense that is reasonably likely to provide for zealous advocacy on behalf of the criminal defendant. A claim that a state's method of providing counsel to indigent defendants does not adequately ensure effective assistance of counsel is often referred to as a systemic or structural challenge. *See* Rodger Citron, Note, *(Un)*Luckey v. Miller: *The Case for a Structural Injunction to Improve Indigent Defense Services*, 101 Yale L.J. 481, 486, 501–02 (1991).

In cases involving systemic or structural challenges to the state's system of providing counsel, the focus is not on a post-hoc historical review of a criminal trial, but is instead based on the structure through which indigent defense is provided by the state. A structural challenge involves a realistic assessment of whether the state has provided an adequate framework for ensuring that the right to counsel is realized in cases involving indigent defense.

In cases involving systemic or structural challenges, the state's weighty interest in the finality of a specific criminal judgment is not

---

532 (referring generally to "ineffective-assistance-of-counsel" claims); *Anfinson*, 758 N.W.2d at 499 (same); *Schaer*, 757 N.W.2d at 637–38 (same). As a result, under our prudential rules, we ordinarily consider the substantive standards under the Iowa Constitution the same as those developed by the United States Supreme Court under the Federal Constitution. *State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008); *In re Det. of Garren*, 620 N.W.2d 275, 280 n.1 (Iowa 2000). Even in cases where no substantive distinction has been advanced by the parties, we reserve the right to apply the principles differently. *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009); *Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI II)*, 675 N.W.2d 1, 6 (Iowa 2004).

involved. As a result, a showing of "actual prejudice" in a particular case is arguably not applicable; instead, what is required is a showing that the structural feature being challenged threatens or is likely to impair realization of the right to effective assistance of counsel.

**D. Nature of Structural Concerns Regarding Implementation of Right to Counsel for Indigents.**

1. *Concerns regarding state efforts to implement* Gideon. In the wake of *Gideon*, the states have developed various mechanisms to provide indigent defendants with effective assistance of counsel. Notwithstanding the efforts of the states, including Iowa, there have been expressions of concern nationally regarding the degree to which the efforts have been adequate.

The American Bar Association (ABA) in particular has been concerned about the quality of criminal representation for indigent defendants, issuing repeated reports and opinions raising serious questions about the quality of indigent defense across the nation.[4] In

---

[4]For example, in 1982, the ABA held a hearing to study the funding of indigent defense services. The subsequent report concluded that "the financing of criminal defense services for indigents is generally inadequate." *Gideon Undone: The Crisis in Indigent Defense Funding*, Summary, 1982 A.B.A. Standing Comm. Legal Aid & Indigent Defendants, *available at* http://www.abanet.org/legalservices/downloads/sclaid/ indigentdefense/gideonundone.pdf. In 1993, the ABA Section on Criminal Justice received a report regarding the status of indigent defense. *See* Richard Klein & Robert Spangenberg, *The Indigent Defense Crisis*, 1993 A.B.A. Sec. of Crim. Just. According to the report, the level of funding for a majority of the indigent defense programs around the country "has reached the crisis level and threatens the effective implementation of the Sixth Amendment right to counsel." *Id.* at 1. In 2004, the ABA published a report entitled Gideon*'s Broken Promise: America's Continuing Quest for Equal Justice.* This document declared that the funding for indigent defense services was "shamefully inadequate" and that "indigent defense . . . remains in a state of crisis, resulting in a system that lacks fundamental fairness and places poor persons at constant risk of wrongful conviction." *See* Gideon*'s Broken Promise: America's Continuing Quest for Equal Justice—A Report on the American Bar Association's Hearings on the Right to Counsel in Criminal Proceedings*, 2004 A.B.A. Standing Comm. on Legal Aid & Indigent Defendants 38.

In 2006, the ABA Standing Committee on Ethics and Professional Responsibility issued an opinion calling on public defenders to withdraw from representation when

general, the ABA has expressed concerns about inadequate financing of defense services for indigents and case overloads in public defender offices.[5]  In addition to the ABA, academic criticism of structural deficiencies in the provision of legal defense to indigents has been common.  Only a little more than a decade after *Gideon,* a respected jurist wrote powerful commentary regarding the inadequacy of criminal defense services.  *See* David L. Bazelon, *The Realities of* Gideon *and Argersinger,* 64 Geo. L.J. 811 (1976); David L. Bazelon, *The Defective Assistance of Counsel,* 42 U. Cin. L. Rev. 1 (1973).  Since then, numerous other articles have excoriated the quality of appointed counsel for indigent defendants.  *See, e.g.,* Stephen B. Bright, *Neither Equal Nor Just: The Rationing and Denial of Legal Services to the Poor When Life and Liberty are at Stake,* 1997 Ann. Surv. Am. L. 783 (1997); Richard Klein, *The Eleventh Commandment:  Thou Shalt Not Be Compelled to Render the Ineffective Assistance of Counsel,* 68 Ind. L.J. 363 (1993); Richard Klein, *The Emperor* Gideon *Has No Clothes:  The Empty Promise of the Constitutional Right to Effective Assistance of Counsel,* 13 Hastings Const. L.Q. 625 (1986).  As noted by one author, everyone agrees that *Gideon* was rightly decided, and no one believes it has been implemented. Donald A. Dripps, *Ineffective Assistance of Counsel: The Case for an* Ex

_____

caseloads become unmanageable.  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 06-441 (2006), *available at* http://www.abanet.org/legalservices/sclaid/ defender/downloads/ethics_opinion_defender_caseloads_06_441.pdf.  Finally, in 2009, a distinguished group of bipartisan and ideologically diverse lawyers and judges sounded a warning siren for the states.  *See* Nat'l Right to Counsel Comm., *Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel, Report of the National Right to Counsel Committee* (April 2009), *available at* http:// www.constitutionproject.org/manage/file/139.pdf.  They declared that the resources made available for indigent defense were grossly inadequate.  *See id.* xi.

[5]See footnote 3, above.

Ante *Parity Standard*, 88 J. Crim. L. & Criminology 242, 307–08 (1997) [hereinafter *The Case for an* Ex Ante *Parity Standard*].

None of the above authorities focuses on Iowa and, as a result, no conclusions on the state of indigent defense in Iowa may be drawn from these studies.[6] The authorities do suggest, however, that we should be vigilant in ensuring indigent defendants receive the effective assistance of appellate counsel that the constitution demands. Otherwise, as noted by this court in a case requiring the state to pay for the cost of statutorily required counsel, "the arm of the law will be too short to accomplish its designs." *Hall*, 2 Greene at 476.

2. *Efforts to address structural problems through standards for indigent representation.* In order to put some spine into the highly important but rather vague concept of ineffective assistance of counsel, professional organizations have developed standards for lawyers engaged in the criminal defense of indigent persons. For example, in 1973, the National Legal Aid and Defender Association (NLADA) developed workload standards for public defenders, indicating that a public defender should be engaged in no more than twenty-five appeals per year in order to do the job adequately. *See* Nat'l Advisory Comm'n on Criminal Justice Standards & Goals, Nat'l Legal Aid & Defender Ass'n, *Standards for Defense*, Standard 13.12 (1973), *available at* http://www.nlada.org/

---

[6]Indigent defense in Iowa, however, has not been free from professional criticism. In 1999, Professor Robert Rigg published a study that focused in part on the provision of criminal defense services in Iowa. Among other things, Rigg noted the low rates of criminal counsel compared to counsel retained by the state for other matters and the high caseload carried by at least some public defenders in Iowa. *See* Robert Rigg, *The Constitution, Compensation, and Competence: A Case Study*, 27 Am. J. Crim. L. 1, 27–34 (1999). Rigg declared that the controlling factor in the Iowa system is "cost containment rather than client representation." *Id.* at 35.

Defender/Defender_Standards/Standards_For_The_Defense [hereinafter *Standards for the Defense*].

Also, if *Gideon* is implemented by contracting with lawyers, ABA and NLADA standards require that the lawyers receive reasonable compensation. ABA standards require reasonable compensation for attorneys under contract. ABA Criminal Justice Section Standards, *Providing Defense Services*, Standard 5-3.3(b)(ix) (Am. Bar Ass'n 3d ed. 1992), *available at* http://www.abanet.org/crimjust/standards/defenses _blk.html. The NLADA standard requires compensation at a rate that reflects customary compensation in the jurisdiction for similar services, the time and labor required by the attorney, and the degree of professional skill and experience of the attorney. National Study Comm'n on Defense Servs., Nat'l Legal Aid & Defender Ass'n, *Guidelines for Legal Defense Systems in the United States*, Guideline III-3.1 (1976).

**E. Potential Litigation Approaches to Structural Shortcomings**.

1. *Introduction.* For the most part, the proposed standards have not been expressly or impliedly adopted by local jurisdictions. As a result of the persistent presence of structural problems and the perceived inadequacy of indigent defense, a number of academics have suggested advocates resort to the courts to remedy the situation. *See* Jacqueline McMurtrie, *Unconscionable Contracting for Indigent Defense: Using Contract Theory to Invalidate Conflict of Interest Clauses in Fixed-Fee Contracts*, 39 U. Mich. J.L. Reform 773, 776, 820–21 (2006) (suggesting use of contract-law concepts to invalidate fixed-fee contractual provisions); *see also* Note, Gideon*'s Promise Unfulfilled: The Need for Litigated Reform of Indigent Defense*, 113 Harv. L. Rev. 2062 (2000)

[hereinafter Gideon*'s Promise Unfulfilled*]; Margaret H. Lemos, Note, *Civil Challenges to the Use of Low-Bid Contracts for Indigent Defense,* 75 N.Y.U. L. Rev. 1808 (2000) [hereinafter *Civil Challenges*]. These authorities generally urge courts to explore judicial remedies that do not involve efforts to reverse criminal convictions and thus are not subject to the relatively demanding *Strickland* test.

2. *Federal case law.* There has not been a large body of federal litigation dealing with structural problems in indigent defense. Part of the reason may be that the federal government has been more generous in providing resources for indigent defense. One case of interest, however, is *Luckey v. Harris (Luckey I),* 860 F.2d 1012 (11th Cir. 1988). In this case, indigent persons exposed or potentially exposed to the criminal justice system and their lawyers brought a class action seeking injunctive relief on the ground that Georgia's system of indigent defense violated the Sixth Amendment. *Luckey,* 860 F.2d at 1013. The lawsuit sought to limit the number of cases an attorney could handle, set standards for compensation for court-appointed counsel, and set minimum standards for effective assistance of counsel. *Id.* at 1014. The district court originally dismissed the case for failure to state a claim and for violating the Eleventh Amendment. *Id.* at 1013. The district court ruled that the plaintiffs' action must be dismissed because they failed to show that the Georgia indigent defense system produced "across-the-board" violations of the Sixth Amendment under *Strickland. Id.* at 1016.

In reversing the district court, the Court of Appeals for the Eleventh Circuit held that the *Strickland* standard did not apply in the case. *Id.* at 1017. The court stated:

> [D]eficiencies that do not meet the "ineffectiveness" standard may nonetheless violate a defendant's rights under the [S]ixth [A]mendment. In the post-trial context, such errors

> may be deemed harmless because they did not affect the outcome of the trial. Whether an accused has been prejudiced by the denial of a right is an issue that relates to relief—whether the defendant is entitled to have his or her conviction overturned—rather than to the question of whether such a right exists and can be protected prospectively.

*Id.* In short, the right to counsel according to the Eleventh Circuit does not simply protect the defendant from trial outcomes. The court concluded that the *Strickland* "concern[] for finality, concern that extensive post-trial burdens would discourage counsel from accepting cases, and concern for the independence of counsel" did not apply in a setting where only prospective relief was sought. *Id.*

Ultimately, the *Luckey* litigation was brought to a halt through application of *Younger* abstention. *Luckey v. Miller (Luckey V)*, 976 F.2d 673, 679 (11th Cir. 1992); *see generally Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971) (articulating the abstention doctrine). Nonetheless, the Eleventh Circuit decision stands for the proposition that even federal courts may recognize that *Strickland* prejudice standards do not apply with respect to structural challenges under the Sixth Amendment to the means of providing indigent defense.[7]

3. *State court cases.* A number of theories have been advanced in state courts to challenge fee caps on attorneys who represent indigent defendants. These theories include those based in "takings" law, on the inherent powers of the courts to supervise the judicial process, and on

---

[7]The issue of *Strickland*'s applicability in a structural challenge has not been tested before the United States Supreme Court. Justice Blackman, however, has expressed concern about structural obstacles to effective assistance of counsel. In *McFarland v. Scott*, 512 U.S. 1256, 114 S. Ct. 2785, 129 L. Ed. 2d 896 (1994), Justice Blackman decried a denial of certiorari in a death penalty case, noting "the absence of funds to compensate lawyers prevents even qualified lawyers from being able to present an adequate defense." *McFarland*, 512 U.S. at 1257, 114 S. Ct. at 2786, 129 L. Ed. 2d at 897 (Blackmun, J., dissenting).

the constitutional requirements of providing effective assistance of counsel in criminal proceedings. All of the theories have one common function—avoiding the application of the high *Strickland* standards in dealing with the systemic problems related to the provision of criminal defense.

Some courts have invalidated fee caps on grounds that the fee caps amount to a taking of the property of attorneys in violation of due process of law. *See, e.g., DeLisio v. Alaska Superior Ct.*, 740 P.2d 437, 442–43 (Alaska 1987); *Arnold v. Kemp*, 813 S.W.2d 770, 775 (Ark. 1991); *State ex rel. Stephan v. Smith*, 747 P.2d 816, 842 (Kan. 1987); *State v. Lynch*, 796 P.2d 1150, 1158 (Okla. 1990); *see also State ex rel. Partain v. Oakley*, 227 S.E.2d 314, 319 (W. Va. 1976), *superseded by statute*, W. Va. Code § 29-21-1 (1989), *as recognized in State ex rel. White v. Trent*, 519 S.E.2d 649, 652 (W. Va. 1999). These cases, however, invariably involve situations where the attorney is involuntarily appointed to represent the indigent defendant, a circumstance that is not present in this case.

Other courts have invalidated fee caps on the ground that they unduly invade the power of the courts to regulate the practice of law and judicial proceedings. *See, e.g., White v. Bd. of County Comm'rs*, 537 So. 2d 1376, 1380 (Fla. 1989) (explaining that the judiciary's "inherent power to award attorney's fees in excess of the . . . statutory fee cap" permits a court to award fees in excess of the statutory maximum); *Makemson v. Martin County*, 491 So. 2d 1109, 1111 (Fla. 1986) (finding that a statutory fee limitation is unconstitutional "when applied in such a manner as to curtail the court's inherent power to ensure the adequate representation of the criminally accused"); *In re Recorder's Ct. Bar Ass'n*, 503 N.W.2d 885, 897 (Mich. 1993) (striking down fixed-fee system and

directing development of an alternate system of payment); *Smith v. State*, 394 A.2d 834, 838 (N.H. 1978) (declaring what constitutes reasonable compensation is peculiarly within the judicial province and determination of reasonableness is a judicial power implicitly in the constitutional scheme); *Lynch*, 796 P.2d at 1163 (reasoning that the Oklahoma Supreme Court's "constitutional responsibilities" and "inherent power" compelled the conclusion that the practice of compulsory appointment of attorneys without providing adequate compensation amounted to an unconstitutional taking of private property). The common thread in these cases is that the judiciary has the inherent constitutional responsibility over the judicial process and that responsibility extends to ensuring that indigent criminal defendants are provided adequate counsel.

A few courts have considered challenges to fee structures on due process and ineffective-assistance-of-counsel grounds. For example, in *State v. Smith*, 681 P.2d 1374, 1376 (Ariz. 1984), the Arizona Supreme Court considered the validity of a low-bid contract for the provision of services to indigent defendants in Mohave County, Arizona. The court concluded the system as implemented violated federal constitutional rights to due process and assistance of counsel. *Smith*, 681 P.2d at 1381. Among other things, the court noted that the system violated the ABA standards for criminal justice and the NLADA guidelines by failing to consider the time each attorney must spend in representation. *Id.* at 1379–81. The court concluded that there would be a presumption that the system adversely affected the adequacy of representation in Mohave County. *Id.* at 1384; *see also* Suzanne Mounts, *The Right to Counsel and the Indigent Defense System*, 14 N.Y.U. Rev. L. & Soc. Change 221, 226–

27, 231 (1986) (arguing for shifting burdens of proof where systemic shortcomings are present in indigent-defense representation).

Sometimes the pressure of potential constitutional violations has influenced the interpretation of a state statute authorizing payment of fees for indigent defense. Specifically, in *Bailey v. State*, 424 S.E.2d 503, 508 (S.C. 1992), the court held that controlling statutes could not be interpreted as establishing absolute maximum remuneration for costs and fees because they do not provide adequate compensation to ensure effective assistance of counsel in capital cases. And, in *May v. State*, 672 So. 2d 1307, 1308–09 (Ala. Crim. App. 1993), the court avoided the prospect of declaring a fee cap unconstitutional by a generous construction of the underlying statute to allow reimbursement for "overhead expenses." *See also Wilson v. State*, 574 So. 2d 1338, 1340 (Miss. 1990) (noting that courts will construe a maximum-fee statute " 'to enable [the statute] to withstand the constitutional attack and to carry out the purpose embedded in the [statute]' " (quoting *Frazier v. State ex rel. Pittman*, 504 So. 2d 675, 708 (Miss. 1987))).[8]

While the structural ineffective-assistance-of-counsel cases involve multiple theories, there are several themes that run throughout them. First, the cases see a linkage between compensation and the provision of effective assistance of counsel. *See, e.g., Makemson*, 491 So. 2d at 1114

---

[8]In contrast, in *State v. Bacon*, 658 A.2d 54, 66 (Vt. 1995), an attorney assigned a complex murder case at a rate of $25 per hour sought to withdraw because the state failed to pay his fee in a timely manner. Counsel also failed to test DNA evidence or cross-examine the State's DNA experts. *Bacon*, 658 A.2d at 67. On appeal, a claim of conflict of interest was raised. *Id.* The court found that the conflict was present, but held that there was no prejudice under *Strickland*. *Id.* at 68. For other cases applying the *Strickland* test to structural challenges, *see Stephan*, 747 P.2d at 831–32; *State v. Robinson*, 465 A.2d 1214, 1216 (N.H. 1983); *Madden v. Township of Delran*, 601 A.2d 211, 215 (N.J. 1992); *State ex rel. Friedrich v. Circuit Ct.*, 531 N.W.2d 32, 40–44 (Wis. 1995).

("The link between compensation and the quality of the representation remains too clear."); *Jewell v. Maynard*, 383 S.E.2d 536, 544 (W. Va. 1989) (concluding that it is unrealistic to expect appointed counsel to remain "insulated from the economic reality of losing money each hour they work"). Second, they challenge the notion that members of the bar have an ethical obligation to pick up the gauntlet and provide assistance of counsel in light of the state's default. *See, e.g.*, *Makemson*, 491 So. 2d at 1114–15 (stating that pro bono implementation is haphazard, is unfairly imposed in practice, and causes attorneys to bear the burden of the state because of the increasing complexity and rising costs of cases); *Stephan*, 747 P.2d at 835–36 (explaining that the obligation to provide counsel for indigent defendants is that of the state); *Jewell*, 383 S.E.2d at 543 (declaring notion that lawyers had obligation to provide services to indigents free of charge has been "decimated" in recent scholarship establishing the narrowness of English tradition and lack of applicability in modern day setting). Third, they regard separation-of-powers concepts as not presenting an obstacle to judicial action to ensure that the right to counsel as guaranteed by state and federal constitutions is effectively honored. *See, e.g.*, *Stephan*, 747 P.2d at 842–43 (finding no separation-of-powers issue in determining reasonable fee for indigent defense); *Wilson*, 574 So. 2d at 1342 (Robertson, J., concurring) ("If an adequate courthouse is essential to the administration of justice, so are competent counsel."); *Smith*, 394 A.2d at 838 (noting that if the obligation to represent indigent defendants springs from judicial authority, so too does authority to determine reasonable compensation).

4. *Iowa case law.* The first Iowa cases dealing with compensation of court-appointed attorneys indicated that the courts had common law power to provide for compensation of appointed counsel. *See Hall*, 2

Greene at 476–78. In *Hall*, a case decided before the constitution of 1857 was adopted, the Iowa court held that where services were performed by a lawyer appointed

> in obedience to direct mandate of statutory law, under the direction of a tribunal to which the enforcement of that law is committed, reasonable compensation to the person who performs that service is a necessary incident; otherwise, the arm of the law will be too short to accomplish its designs.

*Id.* at 476; *see generally* Robert Rigg, *The Constitution, Compensation, and Competence: A Case Study*, 27 Am. J. Crim. L. 1, 47–48 (1999) (concluding that "[u]nderfunding abandons the Sixth Amendment's mandate that every citizen charged with a crime deserves effective assistance of counsel").

This court followed *Hall* almost a century later in *Ferguson v. Pottawattamie County*, 224 Iowa 516, 278 N.W. 223 (1938). In *Ferguson*, the court held that court-appointed lawyers who represented two juvenile defendants were entitled to compensation for their services from the public notwithstanding the lack of any specific statutory authorization for compensation. 224 Iowa at 519–20, 278 N.W. at 224.

After *Gideon*, this court considered a number of cases involving fees for defense counsel. In *Soldat v. Iowa District Court*, 283 N.W.2d 497, 498 (Iowa 1979), the court considered the meaning of legislation authorizing reasonable compensation for indigent defense decided by the trial court on a case-by-case basis. The court found that "reasonable" fees did not mean compensation normally charged for a privately retained case. *Soldat*, 283 N.W.2d at 499. The court reasoned that a discount from a fee that would be obtained in a private case was appropriate in light of the ethical obligation of lawyers to represent the defenseless and the oppressed. *Id.* at 499–500.

In *Hulse v. Wilfvat*, 306 N.W.2d 707, 708 (Iowa 1981), the court considered reasonable compensation for appointed counsel under a statute that defined reasonable compensation as including "the ordinary and customary charges for like services in the community." The court determined that, under this statute, full compensation for reasonably necessary services was appropriate but emphasized that a factor to be considered was certainty of payment. *Hulse*, 306 N.W.2d at 712.

The issue of permissible restrictions on fees for representation of indigent defendants in criminal proceedings was revisited in *Coonrad v. Van Metre*, 362 N.W.2d 197 (Iowa 1985). In *Coonrad*, the majority of the court held that a fee of $40 per hour—awarded pursuant to a judicial district rule establishing $40 as an average to be paid for criminal defense—was not an abuse of discretion, notwithstanding testimony from other attorneys that they received fees of $50 to $75 per hour for similar work. *Coonrad*, 362 N.W.2d at 199–200. In a concurring opinion, Justice Schultz declared,

> I believe that it is self-evident that to attract able counsel to accept court appointments, the State must provide adequate remuneration. As in any other profession, the skills and abilities of attorneys that practice law vary. The more able attorneys can command larger fees. Despite ethical considerations, it is obvious that modern day law offices have high overhead which must be paid from the fees that a lawyer can generate.

*Id.* at 201 (Schultz, J., concurring).

In September 1985, the court issued guidelines on costs of court-appointed counsel. The guidelines generally provided for a procedure for establishing fees for court-appointed counsel. *See* 1985 Iowa Supreme Ct. Supervisory Order, *In re Costs of Court-Appointed Counsel* ¶ 1. The guidelines expressly stated that there should be no discount based upon an attorney's duty to represent the poor. *Id.* ¶ 6. The guidelines

established fee caps for classes of criminal offenses which could, however, be exceeded with prior approval of the district court. *Id.* ¶ 4(b). The guidelines expressly stated that they did not "prevent public bodies from establishing public defender offices pursuant to statute or from entering contracts for attorney services consistent with constitutional and statutory constraints." *Id.* ¶ 2.

Compensation afforded under the guidelines was challenged in *Postma v. Iowa District Court*, 439 N.W.2d 179 (Iowa 1989). In *Postma*, an appointed lawyer sought to recover $6546 at $60 per hour. *Postma*, 439 N.W.2d at 180. The district court, however, approved only payment at $45 per hour up to the cap of $1000 for the type of crime involved. *Id.* In *Postma*, the lawyer's claim for additional compensation failed for two reasons. First, the lawyer failed to obtain prior approval for a fee in excess of the categorical caps as required by the rule. *Id.* at 182. Second, the court held that there was no chilling effect with respect to state or federal constitutional rights in light of the fact that the defendant was found not guilty. *Id.*

Fee issues were revisited in *Lewis*. In this case, attorneys challenged the guidelines as violating equal protection principles. *Lewis*, 555 N.W.2d at 217. The court noted that the court-appointed attorneys prosecuting the case had standing to challenge the constitutionality of the statutory fee schedule because the rights of the attorneys were "inextricably linked" with the rights of indigent defendants. *Id.* On the merits, however, the court rejected the plaintiffs' claims. *Id.* at 219–21. The court inaccurately stated that Sixth Amendment claims in similar cases "have not been [found] tenable unless the court-appointed counsel is totally uncompensated or unless the bar is required to assume the entire burden of indigent defense." *See id.* at 220. The court apparently

believed that the *Strickland* standard of prejudice for postconviction relief actions applied in a claim for pretrial relief, rejected application of any presumption of ineffectiveness, and suggested that the plaintiffs' case was deficient because there was no showing that a particular litigant was placed at a disadvantage by the fee guidelines. *See id.* at 219–21. The court cited with approval *Ex parte Grayson*, 479 So. 2d 76 (Ala. 1985), one of the harsher Sixth Amendment cases where the Alabama Supreme Court upheld an expense maximum of $500 and an attorney fee maximum of $1000 in capital cases. *See id.* at 219–20; *see also Ex parte Grayson*, 479 So. 2d at 79–80.

**IV. Construction of Statutes in Light of Constitutional Principles.**

**A. Introduction.** We now consider the proper construction of the various provisions of Iowa Code chapter 13B in light of the potential constitutional implications of article I, section 10 of the Iowa Constitution. In order to do so, we examine the potential merit of the underlying constitutional claims. In this undertaking, it is not necessary to make an express holding on the constitutional issue. *See Thompson*, 259 Iowa at 468, 143 N.W.2d at 330; *Miller*, 253 Iowa at 218, 111 N.W.2d at 676. We need only find that the constitutional issues are sufficiently serious that the statute should be interpreted in a fashion to avoid constitutional difficulties, if reasonably possible. *See Thompson*, 259 Iowa at 468, 143 N.W.2d at 330; *Miller*, 253 Iowa at 218, 111 N.W.2d at 676.

**B. Obstacles to Consideration of Constitutional Issues.** We first clear away some procedural underbrush. There is some question regarding whether a lawyer has standing to assert the constitutional claims arising from systemic right-to-counsel claims. *See Portman v.*

*County of Santa Clara,* 995 F.2d 898, 902 (9th Cir. 1993). We have held, however, that a lawyer appointed to represent an indigent defendant has standing to assert the constitutional claims of defendants' rights under article I, section 10 of the Iowa Constitution. *Lewis,* 555 N.W.2d at 218–19. We have found that the issues of a defendant's right to effective assistance of counsel and an attorney's right to fair compensation are "inextricably linked." *Id.* at 219; *see also Makemson,* 491 So. 2d at 1112.

There is also a question of whether Simmons must show *Strickland*-type prejudice in this case in order to raise constitutional issues. Where, as here, we are interpreting a statute to *avoid* potential constitutional problems, we do not believe a showing of "actual prejudice" in the case before us is required. Indeed, through our construction of the applicable statutes, we are seeking to avoid potential prejudice in the future. Although Simmons has already performed his legal service, our consideration of the constitutionality of the hard-fee cap is akin to a prospective challenge that requires establishment of an *ex ante* or before-the-fact standard. *See The Case for an* Ex Ante *Parity Standard,* 88 J. Crim. L. & Criminology at 243 (concluding that the "*Strickland* inquiry into counsel's effectiveness *ex post* should be supplement[ed] by an *ex ante* inquiry into whether the defense is institutionally equipped to litigate as effectively as the prosecution."); Gideon's *Promise Unfulfilled,* 113 Harv. L. Rev. at 2070–71 (citing *Smith,* 681 P.2d at 1378 for the propositions that the prospective inquiry into the method of providing counsel to indigent defendants is "both different from the retrospective fairness inquiry and also necessary for compliance with the Sixth Amendment"). The constitutional concerns in this case are not based upon the performance of defense counsel but upon the possibility that a statutory framework through which counsel is provided

has potential constitutional infirmities. *See Wallace v. Kern*, 392 F. Supp. 834, 847 (E.D.N.Y. 1973), *vacated on other grounds*, 481 F.2d 621 (2d Cir. 1973); *Civil Challenges*, 75 N.Y.U. L. Rev. at 1824.

We conclude that the *Strickland* prejudice test does not apply in cases involving systemic or structural challenges to the provision of indigent defense counsel that do not involve efforts to vacate criminal convictions. As pointed out in *Luckey*, the weighty policy reasons for the high *Strickland* bar—namely, finality in criminal judgments and the fear of a rash of ineffective-assistance claims—are simply not present here.[9] 860 F.2d at 1017; *see also Pruett v. State*, 574 So. 2d 1342, 1359 (Miss. 1990); *N.Y. County Lawyers' Ass'n v. State*, 745 N.Y.S.2d 376, 384 (Sup.

---

[9]The approach of *Strickland* to ineffective-assistance claims in the postconviction context has its detractors. In his dissent, Justice Marshall suggested, among other things, that it would be very difficult for a court to determine "prejudice" based on an inadequate record developed by incompetent or ineffective counsel. *Strickland*, 466 U.S. at 710, 104 S. Ct. at 2076, 80 L. Ed. 2d at 708 (Marshall, J., dissenting). Academic commentary has been critical as well. *See, e.g.*, Stephanos Bibas, *The Psychology of Hindsight and After-the-Fact Review of Ineffective Assistance of Counsel*, 2004 Utah L. Rev. 1, 11 (2004); Sanjay K. Chhablani, *Chornically Stricken: A Continuing Legacy of Inffective Assistance of Counsel*, 28 St. Louis U. Pub. L. Rev. 351, 390 (2009); Donald A. Dripps, *Ineffective Assistance of Counsel: The Case for an* Ex Ante *Parity Standard*, 88 J. Crim. L. & Criminology 242, 270–71 (1997); William S. Geimer, *A Decade of* Strickland*'s Tin Horn: Doctrinal and Practical Undermining of the Right to Counsel*, 4 Wm. & Mary Bill Rts. J. 91, 124 (1995); Jeffrey L. Kirchmeier, *Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the* Strickland *Prejudice Requirement*, 75 Neb. L. Rev. 425, 455–63 (1996); Richard Klein, *The Constitutionalization of In Effective Assistance of Counsel*, 58 Md. L. Rev. 1433, 1445–52 (1999).

Regardless of the merits of the criticism, there is a hydraulic relationship between the appropriateness of the *Strickland ex post* test in challenging convictions and the degree to which the court is willing to take meaningful steps *ex ante* to mitigate systemic or structural shortcomings in the right to counsel at trial. By addressing systemic deficiencies at the front-end of the criminal process, it becomes more acceptable to impose a relatively high bar for the vacation of convictions in postconviction actions. The greater the systemic assurance that a defendant is provided with effective trial counsel, the lesser the need for a broad avenue of postconviction relief. *See generally Pruett*, 574 So. 2d at 1359 (discussing the relationship between *ex post* and *ex ante* analyses of ineffective-assistance claims). To the extent, however, that structural problems make effective assistance of counsel more difficult, application of the relatively high bar to successful claims under the *Strickland* rule is correspondingly less defensible.

Ct. 2002). In this case, the only issues relate to the enforceability of a rule that limits the fee for appointed counsel and a contract provision incorporating the rule. The state's weighty interest in finality of criminal convictions is not affected. In this setting of a fee challenge, we hold that a lawyer may mount a successful challenge by showing that the fee restrictions, if enforced, would have a substantial chilling effect on the constitutional rights of criminal defendants. There is no requirement of showing actual prejudice in a particular case. We question the continuing validity of *Lewis* and any other precedent to the extent that they are contrary to this proposition.

We also do not believe separation-of-powers concepts prevent us from interpreting the statutes in a fashion to avoid potential constitutional problems. It is the responsibility of the judicial branch to ensure that indigents receive effective assistance of counsel as required by article I, section 10. While it is true that an adverse ruling will have some fiscal impact on the state, this is true in many situations. If the court was constrained any time a ruling had fiscal impact, *Gideon* itself, which has been characterized as an "enormous unfunded mandate imposed upon the states," would have been wrongly decided. *See* Norman Lefstein, *In Search of* Gideon*'s Promise: Lessons from England and the Need for Federal Help*, 55 Hastings L.J. 835, 843 (2004).

**C. Substance of Systemic Right-to-Counsel Issues in This Case.** We now consider the extent to which Simmons's constitutional claims have merit. We begin by considering whether ethical considerations are sufficient to trump structural right-to-counsel claims based on grossly inadequate compensation. The district court in this case relied upon *Dillon*, 346 F.2d at 637–38, which held that attorneys

are ethically obligated to provide adequate representation without compensation.

Modern scholarship, however, has persuasively discredited the *Dillon* view that historical traditions mandate attorneys to represent criminal defendants for free or for little compensation. *See* David Shapiro, *The Enigma of the Lawyer's Duty to Serve*, 55 N.Y.U. L. Rev. 735, 740–49 (1980) (noting that the duty in English law was limited to the very group of officers who had extraordinary privileges at court and did not apply to ordinary attorneys); *see also DeLisio*, 740 P.2d at 441; *Stephan*, 747 P.2d at 839–42; *State ex rel. Scott v. Roper*, 688 S.W.2d 757, 762–69 (Mo. 1985).

Further, the notion that the state's obligations can be satisfied indirectly through attorneys volunteering their time and effort arise from the days when a criminal trial was not a long and complicated affair and any generally trained lawyer could step in and handle a case or two without substantial financial sacrifice. Those days have long passed as the criminal law has increased in complexity, and the cost of operating a law office has risen dramatically. *Makemson*, 491 So. 2d at 1114; *Jewell*, 383 S.E.2d at 542. The suggestion in *Lewis* that authorities do not support a systemic right-to-counsel claim unless the substantial burden of indigent defense is born by lawyers was inaccurate at the time and is now out-of-step with present day realities in the legal profession.

In analyzing the merits of Simmons's systemic or structural claims, it is important to focus precisely on what the challenged rule provides. It states that for appellate work, there is a fee cap of $1500 unless counsel can demonstrate that the work is "beyond the purview of

both the attorney and the state public defender."[10]  Iowa Admin. Code r. 493—12.5(4).  In other words, under the state public defender's rule involved in this case, the attorney must demonstrate that he or she is not capable of providing the representation and that the state public defender cannot provide it either.  In appellate work, an experienced criminal lawyer will be hard pressed to say that the work is beyond his or her capability.  What is required, however, in a substantial criminal appeal is the dedication of time and effort far in excess of compensation of $1500 at an hourly rate of $50 per hour.

This case, then, does not involve a flexible approach to fees where an attorney can show the reasonableness and necessity of fees in excess of a target amount.  Thus, *Lewis* and *Postma*, which emphasized the flexibility of the fee structures at issue in those cases, are inapposite. *See Lewis*, 555 N.W.2d at 220; *Postma*, 439 N.W.2d at 182.  Here, we are dealing with a hard cap that prevents an attorney from recovering additional fees even in a case where effort in excess of that authorized is reasonable and necessary.

We also note that the concepts of "reasonable fee" and the constitutional requirements of effective assistance of counsel are related but not identical.  A lawyer could receive a "reasonable fee" for very little work, but a minimal performance might not provide effective assistance of counsel in a particular case.  The focus is thus not solely on providing the lawyer with a reasonable fee, although that is important, but on

---

[10]In his reply brief, Simmons notes that the rule was amended after the district court's ruling.  No one argued, however, that the amended rule provides the rule of decision in this case.  We note that the new rule has somewhat more flexibility than what we have characterized as the hard cap in the rule before the court.  The new rule establishes a fee cap, but allows the fee cap to be exceeded in unusually complex cases. We take no view, however, as to whether the new rule meets systemic constitutional requirements imposed by article I, section 10.

showing that the system is designed to ensure that an indigent defendant receives effective assistance of counsel. Here, we focus not on establishing a system that provides reasonable compensation to a lawyer, but on one that is designed to provide effective assistance of counsel. *See Makemson*, 491 So. 2d at 1112 (noting what is at stake in a fee-cap challenge was the right to effective representation rather than the attorney's right to fair compensation).

Based on our review of the case, we conclude that the plaintiff has shown that if Iowa imposes a hard-and-fast fee cap of $1500 in all cases, such a fee cap would in many cases substantially undermine the right of indigents to effective assistance of counsel in criminal proceedings under article I, section 10 of the Iowa Constitution. In reaching this conclusion, we look at the facts of this case from three different perspectives. All point to a profound chilling effect of the fee cap in this case that, in effect, establishes a hard $1500 limitation on counsel.

First, we examine what the fee cap would mean for a full-time attorney providing representation in criminal appeals. Under the NLADA standards, a lawyer who handles appeals should limit his or her workload to twenty-five appeals per year. *Standards for the Defense*, Standard 13.12. Under this standard, a full-time lawyer working pursuant to the appellate defender's rule could receive a gross income of $40,000. *See id.* From this figure, the attorney must pay for overhead which, according to the Iowa State Bar Association survey offered into evidence in this case, was, for the average Iowa lawyer, in excess of $70,000. Even assuming that a criminal defense lawyer working on appeals would have less overhead than the average Iowa lawyer, it seems clear that it would be very difficult for a lawyer working under the state public defender's rule to earn a living.

Second, we look at this case by considering the hourly rate paid to Simmons for what the record establishes were reasonable and necessary services. His hourly rates for the cases amount to $12.56 for Millam's appeal and $12.27 for Cromer's appeal. Over the long run, payment of such hourly rates to appellate counsel will have a chilling effect on qualified lawyers taking this work and would discourage thorough appellate preparation.

Third, we use our own expertise in considering the impact of a $1500 fee cap for appellate work. *State v. See*, 387 N.W.2d 583, 586 (Iowa 1986) (stating that courts are experts in determining reasonable fees); *Smith*, 394 A.2d at 838 (stating "it is peculiarly within the judicial province to ascertain reasonable compensation" for court-appointed counsel). No one can dispute that competent appellate representation requires thorough mastery of the underlying facts, communications with the client, research into applicable legal issues, consideration of which issues to present on appeal, and then careful writing and rewriting. A hard-fee cap of $1500 simply cannot provide adequate compensation in many cases, including the two cases at issue here.

The implications of the inadequate compensation framework on the provision of effective assistance of appellate counsel are multiple. First, inadequate compensation will restrict the pool of attorneys willing to represent indigent defendants. *See State ex rel. Friedrich v. Circuit Ct.*, 531 N.W.2d 32, 42–43, 44 (Wis. 1995); *see also Coonrad*, 362 N.W.2d at 201 (Schultz, J., concurring). Second, the low level of compensation threatens the quality of indigent representation because of the perverse economic incentives introduced into the criminal justice system. *See, e.g., Makemson*, 491 So. 2d at 1112 (noting inextricable linkage between compensation and defendants' rights to effective assistance of counsel);

*Stephan*, 747 P.2d at 831 (observing inadequate compensation causes inherent conflicts between attorney and client); *Jewell*, 383 S.E.2d at 544 (stating it is unrealistic to expect appointed counsel to remain insulated from economic reality when losing money). Low compensation pits a lawyer's economic interest (recall Lincoln's metaphor that a lawyer's time is his stock in trade) against the interest of the client in effective representation. *See* Adele Bernhard, *Take Courage: What the Courts Can Do to Improve the Delivery of Criminal Defense Services*, 63 U. Pitt. L. Rev. 293, 321 (2002) (declaring conflict of interest between attorney and client in fixed-fee cases as "real"); *see also Smith*, 681 P.2d at 1381 (holding fixed-price contract to represent defendants in county unconstitutional for, among other things, failure to take into account time that the attorney is expected to spend representing defendants, failure to provide support costs, and failure to take into account the complexity of each case); *Olive v. Maas*, 811 So. 2d 644, 652 (Fla. 2002) (stating mandatory fee caps create "economic disincentive[s] for appointed counsel to spend more than a minimal amount of time on case").

**D. Construction of Statutes to Avoid Constitutional Infirmities.** Ordinarily, we construe statutes to avoid potential constitutional infirmity if we may reasonably do so. *Visser*, 629 N.W.2d at 380; *see also White*, 545 N.W.2d at 557. We are also confident that the legislature intended chapter 13B to implement Sixth Amendment rights. *See* Iowa Code § 13B.2A (stating fee-limitation recommendations "shall be consistent with the constitutional requirement to provide effective assistance of counsel to those indigent persons for whom the state is required to provide counsel"). In light of these principles, we construe Iowa Code section 13B.4(4)(*a*) as not authorizing hard-fee caps applicable in all cases. Instead, in order to avoid constitutional

difficulties, we construe the term "fee limitations" to authorize only a range of hourly rates that might be charged, the procedure for making fee claims, and soft-fee caps in categories of cases that may be rebutted by a showing of reasonableness and necessity under Iowa Code section 13B.4(4)(*d*)(6). *See Bailey*, 424 S.E.2d at 508. As a result of this interpretation, however, we find that the administrative rule in this case establishing a hard-fee cap of $1500 for a criminal appeal violates the statute and thus cannot be enforced against Simmons.

We also find that the implementing provision in Simmons's contract violates public policy. Although parties may incorporate administrative rules as terms of a contract, the terms are not enforceable if they are contrary to the intent of the enabling statute. *See Bank of the West v. Kline*, 782 N.W.2d 453, 462 (Iowa 2010) ("It is well-established Iowa law that contracts made in contravention of a statute are void, and Iowa courts will not enforce such contracts."). We will not enforce a contractual provision that has a chilling effect on the constitutional rights of criminal defendants and is inconsistent with the legislature's intent to provide indigent defendants with effective assistance of counsel.

**V. Conclusion.**

For the above reasons, we reverse the decision of the district court and remand the matter to the district court for a determination of reasonable and necessary fees that are consistent with the constitutional mandate of effective assistance of counsel.

**REVERSED AND REMANDED.**