23754

James D. BAILEY, William D. Sussman and James R. Johnson, Respondents v. The STATE of South Carolina and Aiken County, South Carolina, a body politic and corporate and political subdivision of the State of South Carolina, and Louis L. Rosen, Director for Court Administration, Defendants, of whom Aiken County, South Carolina, a body politic and corporate and political subdivision of the State of South Carolina is the Primary Appellant, and The State of South Carolina and Louis L. Rosen, Director for Court Administration are Secondary Appellants. Appeal of Aiken County, South Carolina.

(424 S.E. (2d) 503)

Supreme Court

*Robert M. Bell* and *Dennis M. Gmerek,* both of Langley, *for appellant Aiken County.*

*Chief Deputy Atty. Gen. Edwin E. Evans* and *Asst. Atty. Gen. Samuel L. Wilkins,* Columbia, *for appellants The State*

*of South Carolina* and *Louis L. Rosen, Director of Court Admin.*

*Ronald A. Maxwell,* of Aiken, *for respondents.*

*Stuart M. Andrews, Jr.,* and *Daniel J. Westbrook, Nelson, Mullins, Riley & Scarborough,* Columbia, *for amicus curiae, S.C. Bar.*

Heard May 5, 1992; Decided Dec. 7, 1992.

Reh. Den. Jan. 6, 1993.

CHANDLER, Justice:

This Court is today called upon to determine whether compensation shall be paid to attorneys appointed to represent indigent defendants who are charged with murder for which, upon conviction, the death penalty (capital murder) may be imposed.

We reach our decision today fully cognizant of the legal profession's traditional and historic role in the general society. It is a role anchored to the postulate that the practice of law is not a marketplace business or commercial venture but, rather, a profession dedicated primarily to service.

This obligation to service is a lifelong commitment of every attorney which finds its noblest expression in the oath administered upon admission to the Bar:

> You will never reject, from any consideration personal to yourself, the cause of the defenseless or oppressed, or delay any man's cause for lucre or malice.

Abidance in both letter and spirit to this commitment has been a hallmark of the legal profession from the very earliest history of South Carolina. Indeed, 58 years prior to the formation of the Union, the 1731 Colonial Legislature, recognizing the imperative that defendants charged with capital murder be provided the assistance of competent counsel, enacted Act No. 530:

> [I]n case any person or persons so accused or indicted shall desire counsel, the court before whom such person or persons shall be tryed, or some judge of that court, shall and is hereby authorized and required, immediately

upon his or their request, to assign to such person and persons such and so many counsel, not exceeding two, as the person or persons shall desire.

*Statutes of South Carolina,* Vol. III, 1717-1753, Page 286.

South Carolina attorneys now actively and enthusiastically participate in a program sponsored by the South Carolina Bar known as "Pro Bono," which renders free legal services to the poor. The number of attorneys contributing their services to this program places the South Carolina Bar among the top three in the nation.

It cannot be overemphasized that the litigation addressed by our decision today is borne not of a purpose to repudiate the historic obligation of the legal profession as described above. Rather, it is borne of a dramatic escalation in the burden of effectively representing a capital case defendant, from the moment of the attorney's appointment to the conclusion of the attorney's responsibility.

It is an understatement that the very livelihood of many attorneys appointed to death penalty trials is threatened by this burden, a result fundamentally unfair to those so impacted. The record before us demonstrates that capital trials today, as never before, present a myriad of complexities heretofore unknown. For example, until very recent years, most capital trials were, from beginning to end, completed within four days. Today, selection of the jury alone often consumes a week or more.

Notwithstanding, attorneys have never hesitated to fulfill their responsibility to indigent defendants. However, as Justice Newbern of the Arkansas Supreme Court aptly observed in *Arnold v. Kemp:* "Time changes everything."[1]

Indeed it does.

## FACTS

On appeal is an Order which declares unconstitutional the statutory scheme[2] setting the amount of attorney's fees allowed to counsel appointed in capital cases, and also the amount allowed for investigative costs and services in such cases.

---

[1] 813 S.W. (2d) 770, 780 (1991) (Newbern, Justice, concurring).

[2] S.C. Code Ann. § 16-3-26(B) and (C) (Supp. 1991), and § 17-3-50 (1985).

Section 16-3-26(B) provides that in all capital cases, two attorneys shall be appointed to represent an indigent defendant, only one of whom may be the public defender. Fees and costs for these attorneys cannot exceed $5,000 per trial from funds appropriated for the defense of indigents. Section 16-3-26(C) provides a cap of $2,500 from such funds for any expert and investigative services associated with the capital trial. Section 17-3-50 provides that private counsel appointed pursuant to the Defense of Indigents Act shall receive a fee of $15 per hour for in-court time and $10 per hour for out-of-court time for their services, not to exceed the $5,000 cap.

State funding for the Defense of Indigents is set by the General Assembly in the annual Appropriations Act, which contains the following provision:

> It is the intent of the General Assembly that any expense incurred in any county for the defense of indigents in excess of the county's share of funds appropriated in this section . . . *shall be borne by the county.* (Emphasis supplied.)

1992 S.C. Acts, 501, § 4.6.

Respondents, Attorneys James Bailey and William Sussman, were appointed to represent Leroy Craig, an indigent defendant charged with kidnapping, armed robbery, and murder in a capital prosecution. Respondent James Johnson (now deceased) was a private investigator also appointed to the case. Through the effective representation of Bailey, Sussman, and Johnson, the charges against Craig were dismissed prior to trial.

Mr. Bailey expended 243.75 hours in preparation of the case and 5 hours in court. Further, he incurred out-of-pocket expenses for photographs, postage, xerox copies, and expert fees in the amount of $1,254.65. Mr. Sussman expended 118.3 hours in preparation of the case and 5 hours in court, and also incurred out-of-pocket expenses of approximately $500. Mr. Johnson expended 264.25 hours investigating the case, and incurred $1,101 in travel expenses, $93 in long-distance phone calls, $152.55 in film processing, and $248.69 for out-of-pocket expenses.

Respondents commenced a declaratory judgment action in the Circuit Court requesting payment for the above fees and

costs incurred in Craig's defense, in excess of those provided by § 16-3-26 and § 17-3-50. The case was referred to the Master-in-Equity for final determination.

The Master declared the payment limited by §§ 16-3-26 and 17-3-50 unconstitutional in that it: (1) violates the defendant's sixth amendment right to effective assistance of counsel; and (2) violates the "takings clause" of the United States and South Carolina Constitutions. He awarded Mr. Bailey and Mr. Sussman attorneys' fees at a rate of $85 per hour and Mr. Johnson investigator's fees at a rate of $40 per hour, plus all expenses incurred.

## DISCUSSION

### A. SIXTH AMENDMENT

The Sixth and Fourteenth Amendments of the United States Constitution compel every State to provide counsel to indigent criminal defendants. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. (2d) 799 (1963). Further, the United States Supreme Court has held that the defendant must have "a fair opportunity to present his defense," thereby requiring the State to provide the "basic tools" for an adequate defense to an indigent defendant. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84, L.Ed. (2d) 53 (1985) (State required to provide defendant access to a psychiatrist where defendant's sanity was in issue at trial). Thus, although the State is not required to provide the indigent defendant with unlimited funding, it must ensure that the defendant has competent counsel and the services of experts necessary to a meaningful defense:

> We recognized long ago that mere access to the courthouse door does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterparts might buy, it has often reaffirmed that fundamental fairness entitles indi-

gent defendants to an 'adequate opportunity to present their claims fairly within the adversary system.'

*Ake, supra,* 470 U.S. at 77, 105 S.Ct. at 1093, 84 L.Ed. (2d) at 62 [internal quotations omitted].

Given the State's obligation to provide effective legal assistance to an indigent, we direct attention to the problem which arises when an attorney appointed to a capital case receives only nominal compensation:

> [I]t would be foolish to ignore the very real possibility that a lawyer may not be capable of properly balancing the obligation to expend the proper amount of time in an appointed criminal matter where the fees involved are nominal, with his personal concerns to earn a decent living by devoting his time to matters wherein he will be reasonably compensated. *The indigent client, of course, will be the one to suffer the consequences if the balancing job is not tilted in his favor.*

*Okeechobee County v. Jennings,* 473 So. (2d) 1314, 1328 (1985) (Emphasis supplied).

The problem is exacerbated in capital case appointments where the attorney is charged with the awesome responsibility of defending a person's life. A death penalty case, in and of itself, is an extraordinary proceeding. *See White v. Board of County Com'rs,* 537 So. (2d) 1376 (1989).

The attorney must be conversant with constantly *new* interpretations of constitutional law by not only the United States Supreme Court, but by courts of all jurisdictions, both Federal and State. Moreover, in preparation for trial, he must investigate the facts and circumstances of the alleged crime with no less vigor and thoroughness than the publicly compensated solicitor, who has at his disposal the entire array of state, county, and municipal law enforcement. Dramatic technological advances, such as the science of DNA (deoxyribonucleic acid) analysis, are employed by prosecutors, requiring defense attorneys to acquire special knowledge and retain expert witnesses.

Capital trials are bifurcated, divided into *guilt* and *sentencing* phase trials. At the commencement of the guilt phase, a more extensive and time-consuming process for selection of

the jury is followed: each juror, individually, must be interrogated by the attorney who, prior to trial, has searchingly researched and probed the background of every prospective juror. A psychologist is frequently employed by both the prosecution and defense to assist and advise in jury selection.

While the greater demands now made upon defense attorneys in the guilt phase are severe, it is in the sentencing phase that new and different issues, heretofore unknown, are introduced as a result of recent decisions of the United States Supreme Court. For example, in today's capital trial, the defendant is entitled to produce evidence concerning his childhood and family background in mitigation of his criminal conduct, so that the jury may impose life imprisonment as an alternative to the death sentence. In preparing this evidence the attorney must employ investigators in the course of thoroughly researching the defendant's entire life.

Mr. Stephen Bright, an expert witness presented by Respondents, and an attorney who has been defense counsel in three capital cases, testified concerning these differences between capital and noncapital trials:

> [L]et me suggest the ways in which I think the capital cases are different and the demands that they place on lawyers and the relationship of that to compensation.
> First of all, the law that a lawyer must know for a capital case is completely different than any other kind of criminal practice. . . . I think a lawyer can be fairly conversant with the Supreme Court decisions . . . on criminal law matters, with the State Supreme Court decisions, [with] intermediate Court of Appeals, and be in a good position to be a very good or above average criminal lawyer for most kinds of cases and the same sort of considerations would translate over to the civil area.
> That is not good enough in a capital area where the defendant's life is at stake.

> \*   \*   \*   \*   \*   \*

> [A] capital case, unlike most other criminal cases, does not just simply go to the State Supreme Court or often be resolved with a—with a guilty plea. They are often in litigation for ten to fifteen years after the sentence is imposed, and whether the lawyer has known the applicable

law and properly preserved the client's rights is critical.

\* \* \* \* \* \*

But to go to the second point, capital cases are two trials. . . . [T]here's a trial in the guilt phase and there's a trial in the penalty phase. . . .

I think most lawyers, most trial lawyers like myself, before I got into this, are used to trying cases where we're talking about a fairly narrow issue and point in time. . . .

The penalty phase of a capital trial involves a person's entire life. Often it involves even before the person was born. . . . Many of the cases I've been involved in involved people who have been severely abused as children, sexually abused, physically abused. And often the families have a very strong interest in keeping that information secret and not letting it be known that the father or the uncle or the grandfather, whoever it may have been, was involved in abuse of that child. Yet, those are compelling mitigating circumstances if they can be developed and documented.

\* \* \* \* \* \*

And a lawyer who handles one of these cases has got to be someone who knows how to coordinate a number of paralegals, investigators and co-counsel in making sure that the investigation of both the guilt phase and the penalty phase are properly orchestrated.

I think capital cases call upon people to possess unique negotiating skills. Often in the cases that I'm involved in, negotiations not only take place with the district attorney, but with the family of the one who died, to see if those people can be convinced to—to settle for a sentence less than death in the case.

\* \* \* \* \* \*

Writing and analytical skills, I think, are more important in litigating capital cases. . . . You can't have a boiler plate motions practice and be competent in a capital case. It has to be fact specific.

\* \* \* \* \* \*

And trial advocacy skills. . . . [C]ertainty in a capital case

where you're dealing with the Constitution of the United States, where you're dealing with the highest stakes of any case in our legal system, a person's life, it is critical that the person who handles that case be at home in the Courtroom and have trial advocacy skills, and know how to present facts and know how to argue effectively and know how to fight the State's case.

* * * * * *

I think the other part of it is the fact that a lawyer who's assigned to a capital case and who is conscientious about it does tend to live with that case day and night because of the stakes involved.

No challenge to Mr. Bright's testimony was offered by either of the Appellants.

Additionally, Mr. Bailey, who has himself been appointed to three capital cases since 1980,[3] testified that the very nature of a capital case and the possibility of counsel's performance being scrutinized at the postconviction relief stage enhances the difficulty of defending a capital case:

[I] underwent a great deal of stress, second guessing myself at every stage of the case to be sure that I did what was expected of me and, if not, what was expected of me, even more than what was expected of me.

Beyond that, Mr. Bailey was further burdened here with an uncooperative defendant. In addition to these problems, Mr. Bailey's responsibility to keep his private practice viable continued daily.

Here, the legal services provided the defendant Craig were exemplary, reflecting great credit upon Messrs. Bailey and Sussman. However, a gross and fundamental unfairness is inflicted upon these attorneys when the fees and compensation fail to cover even the overhead costs of maintaining their law offices.

Given the extraordinary time, effort, and commitment required of defense counsel in capital cases, it is unrealistic to

---

[3] Mr. Bailey testified that, to his knowledge, there have been only four capital cases in Aiken County since he has been in practice and he was appointed to three out of the four. Mr. Sussman has had one other capital appointment.

expect that token compensation will suffice in the future to provide an indigent defendant with the quality of legal representation mandated by the United States Supreme Court.

> Certain pressing realities facing practitioners in today's courts can no longer be ignored. First, the increasing complexity of some of today's cases calls for the investment of more time and effort in order to effectively represent one's client. . . . Second, rising costs must be figured into the equation. . . . *The link between compensation and the quality of representation remains too clear.*

*Makemson v. Martin County,* 491 So. (2d) 1109, 1114 (1986) (Emphasis supplied).

Adverting to the controlling statutes here, we hold that they cannot be interpreted as the absolute maximum amount of remuneration for costs and fees, since they clearly do not provide compensation adequate to ensure effective assistance of counsel in capital cases.[4] This Court has long recognized that legislative acts are to be construed in favor of constitutionality and will be presumed constitutional absent a showing to the contrary. *Bradley v. Hullander,* 277 S.C. 327, 287 S.E. (2d) 140 (1982). Accordingly, we hold that the hourly rates and cap provided in §§ 16-3-26 and 17-3-50 are not absolute allowances in capital cases, but merely limitations upon the State's funds allocated for the Defense of Indigents. It then necessarily falls upon the county to supplement as required in a given case. *McMehan v. York County Council,* 281 S.C. 249, 315 S.E. (2d) 127 (Ct. App. 1984).

The appointed attorney should not expect to be compensated *at market rate,* rather at a reasonable, but lesser rate, which reflects the unique difficulty these cases present as balanced with the attorney's obligation to defend the indigent. This determination, which shall be made at the conclusion of the trial, is within the sound discretion of the trial judge.

Moreover, a determination of an attorney's costs and expenses for trial preparation shall also be made within the discretion of the trial judge:

> We do not suggest that the trial court give carte blanche authority to counsel to incur expenses, but rather it

---

[4] In fact, the hourly rates are the lowest in the nation.

should be within the province of the sound judgment of the trial court to approve such reasonable expenses as are plainly necessary for the defendant to have her day in court and to permit counsel to fairly and adequately present her case.

*Arnold v. Kemp*, 813 S.W. (2d) 770, 777 (1991).

As has been emphasized in this opinion, the awesome burden placed upon an attorney appointed to represent a capital case defendant is incomparably greater than in a noncapital case. The issue of compensation for attorneys appointed to noncapital case is not before the Court, and we express no opinion at this time.

## B. TAKINGS CLAUSE

Since we hold that an attorney appointed to a capital case shall be reasonably compensated from funds of the State and County, we need not address the takings issue.

## CONCLUSION

We recognize that the current system may not be the most equitable in providing compensation to appointed attorneys in capital cases. This is especially true when capital murder occurs within those counties least able to bear such costs. However, any modification of the present system must be addressed to the General Assembly, which, thus far, has contributed clearly inadequate funding for the defense of indigents.

We reverse the Master's findings as to the unconstitutionality of §§ 16-3-26 and 17-3-50. We remand this case for a redetermination of reasonable attorneys' fees and costs, utilizing the guidelines set forth in this opinion, rather than the standards for awards of market rate attorneys' fees in other litigation. We affirm the Master's findings relative to Mr. Johnson's fees and costs.

HARWELL, C.J., and FINNEY, TOAL and MOORE, JJ., concur.