782 S.E.2d 747

**Bobby Joe REEVES, Petitioner,**

**v.**

**STATE of South Carolina, Respondent.**

**Appellate Case No. 2011–187246.**
**No. 5359.**

Court of Appeals of South Carolina.

Heard June 1, 2015.
Decided Nov. 12, 2015.
Rehearing Denied March 24, 2016.

Jeremy Adam Thompson, of Law Office of Jeremy A. Thompson, LLC, of Columbia, for petitioner.

Attorney General, Alan McCrory Wilson and Assistant Attorney General, Megan Harrigan Jameson, of Columbia, for respondent.

SHORT, J.

Bobby Joe Reeves was convicted of first-degree criminal sexual conduct (CSC) with a minor and lewd act upon a child. He appeals from the denial and dismissal of his application for post-conviction relief (PCR), arguing the PCR court erred in finding his trial counsel was not ineffective for failing to investigate and present the testimony of a gynecological expert witness. We reverse.

**FACTS**

Reeves was tried September 17–18, 2002. At the trial, during a video interview, Victim[1] testified Reeves lived with her and her mother in South Carolina. After she and her mother moved to Georgia, Victim stated she visited Reeves every other weekend. Reeves picked her up in Georgia and

---

1. Victim was ten years old at the time of the incident and twelve years old at the time of trial.

took her to stay at his house in South Carolina or her mother drove her to South Carolina. She testified she thought of Reeves as a father figure. Victim testified that during her visits with Reeves, he would "touch her private" with his hands and "sometimes with his private." He would "rub his private on [her] private." She was not wearing clothes when these incidents occurred and sometimes Reeves also was not wearing clothes. She explained Reeves would occasionally ask her to "suck his private" and when she did, "yellow stuff would come out." She stated the "yellow stuff" would "sometimes [go] in [her] mouth" and other times it would go "on [her] private." According to Victim, the weekend of July 4, 2000, was the last time she saw Reeves. She stated Reeves "stuck his finger up [her]" for the first time during that weekend. She testified she was four years old when Reeves began touching her. She told her mother about the sexual abuse after her last visit with Reeves.

Dawn Bridgett, Victim's mother, testified she and Victim moved in with Reeves when Victim was eight months old because they needed a place to live. Bridgett stated Victim and Reeves continued to spend time together after she and Victim moved to Georgia. She recalled the last time Victim saw Reeves was the weekend of July 4, 2000. Bridgett drove Victim to South Carolina and Victim did not want Bridgett to leave. Victim was also "very clingy" when she returned to Georgia. Reeves contacted Bridgett to schedule a visit with Victim toward the latter part of July 2000, but Victim refused to go to Reeves' home. When Bridgett questioned Victim about her decision, Victim discussed incidences that occurred in Reeves' bedroom.[2] After the conversation, Bridgett called her sister and the police. On the following Monday, Bridgett took Victim for a medical examination with Dr. Dennis Bash. Several weeks later, Bridgett took Victim for a medical examination with Dr. Maureen O'Brien Claiborne.[3]

---

2. The trial court limited Bridgett's testimony to "date, time, place, and nature but not any names." Therefore, Bridgett did not testify regarding the specific details of her conversation with Victim, only "[she] played a game with [Victim]. [She] named events, and [Victim] told [her] whether it happened[.]"

3. Dr. Claiborne's name is also spelled Clayborne in the record.

Dr. Bash, an expert in the field of emergency room pediatric care, testified he examined Victim on July 31, 2000. Dr. Bash stated he observed what "appeared to be a healing scar" on Victim's hymen. When asked, "Could you date or in any way tell how much earlier that time [sic] had been inflicted," Dr. Bash responded, "The only thing that you can say about that is that it had time to heal so that it was at least one week before that and probably longer." Dr. Bash opined any kind of penetration, penile or digital, would have caused the injuries. Further, Dr. Bash agreed the healing scar was consistent with some kind of penetration approximately thirty days earlier. During cross-examination, Dr. Bash admitted he did not find any bruising, bite marks, claw marks, or sperm on Victim during the examination. Further, he stated, in "cases where ... it's been a long time period in-between the time that—whatever happened supposedly happened in that time they presented to us—we just do a basic screening evaluation and always recommend that they follow-up in the sexual abuse clinic." On re-direct examination, Dr. Bash maintained he would not have expected to see any bruising or sperm even if he had conducted the examination thirty days prior.

Jodi Lee Lashley, the Child Advocate Program Director at Children's Advocacy Center for Abused Children, testified she conducted a forensic interview of Victim on August 11, 2000. Lashley testified Victim stated she was made to "perform oral sex," "touch the private of the person," and "the person touched her private." Lashley testified Victim stated the incidents took place at a male's home and the male had a roommate named "Jessie."[4] According to Lashley, Victim explained the sexual abuse began occurring when she was four or five years old and the last incident occurred during her last visit with the male. Lashley testified she did not observe any signs that Victim was coached to say something during her interview.

Dr. Claiborne, an expert in pediatrics, testified she examined Victim on August 28, 2000. Dr. Claiborne stated she

4. Victim testified Reeves had a roommate named "Jessie" who was at the home during her visits. Additionally, Jessie Wheaton testified at trial, and stated he and Reeves had been roommates, and "[they had] been living together now off and on, a couple of time[s in] different places."

examined Victim and took cultures because none were taken in the emergency room. Dr. Claiborne explained, "On [Victim's] genital exam, her hymen appeared normal. She [did not] have any tears or scars. She [did not] have any unusual discharge. And the rectal area also appeared to have normal appearance and tone." Dr. Claiborne acknowledged her examination of Victim took place one month after Dr. Bash's initial evaluation and her results were normal. Dr. Claiborne explained it is common to see normal exams in these types of cases. She elaborated,

What we know is that an awful lot of child abuse, sexual abuse in younger children, is not the violent rape kind of things that you sometimes see in adults or in older kids. A lot of the time in younger kids, it is more of a coercion kind of thing. And, you know, yes[,] penile may not leave terrible scars and stuff. But then you're also dealing with children who have never had consensual sex. So they don't know exactly what's all the way inside them, what is part of the way inside them[,] and what's trying to get inside of them. So, yes, we normally see normal exams. Most kids who have been sexually abused will have normal exams.

Dr. Claiborne opined healing would be in the process or would have taken place two months after the incident. She explained, "It would depend upon the degree of healing. If this had been a violent rape, I would [have] expect[ed] ... bleeding and suturing, I would expect that I would see a lot of evidence." Finally, when asked if her findings, two months after the fact, were consistent with a child who had been digitally penetrated, Dr. Claiborne responded, "Yes." On cross-examination, she admitted her results were also consistent with the possibility that nothing happened to Victim.

Dr. Carl Brunie, an expert in child psychiatry and Victim's psychiatrist, testified regarding the behavioral changes he noticed in Victim before and after the alleged incident occurred. He stated he began treating Victim in 1999 because she had a history of anger, self-directed aggression, and biting herself. She had threatened to hurt herself, burned her arms with an eraser, suffered from frequent nightmares, exhibited mood swings, experienced significant anxiety, and often expressed fears of some harm coming to her mother. He explained that during his treatment "[he] felt like there was

history that [he] was missing" and "the picture became considerably clearer after [Victim's] mother reported to [him] that Victim had disclosed the history of sexual abuse." He testified Victim's condition deteriorated after the disclosure as she began to have more nightmares, became depressed and sad, and "would get in the fetal position sucking her thumb, acting like a much younger child."

During closing arguments, the State argued:

But remember what Dr. Bash said when he examined Victim about three weeks after the last time she had seen [Reeves]. There was healing scar tissue in her hymen. Ten year old girls who have not been sexually molested do not have healing scar tissue in their hymen. There is no other explanation other than she was penetrated. A ten year old. We're not taking about a grown woman, a sexually active woman. We're talking about a ten year old. That just doesn't happen on its own. And that is a fact [the defense] cannot overcome.

The State repeated:

[Victim] told you about digital penetration.... And again, 100 percent corroborated by the medical evidence. Three weeks later when a doctor examined her, a doctor who's a pediatric specialist and finds healing scar tissue. It just doesn't happen on its own; not on a ten year old; not in an unsexually active ten year old. It's just not going to be there.... Dr. Bash examines Victim on that day and finds healing scar tissue. Again, there's no other explanation for it other than Victim had been penetrated by something. And that's undisputed testimony.

The jury convicted Reeves of first-degree CSC with a minor and lewd act upon a child, and the trial court sentenced him to concurrent fifteen-year sentences. Reeves filed a direct appeal, and this court affirmed. *See State v. Reeves,* Op. No. 2005–UP–099 (S.C. Ct. App. filed Feb. 10, 2005). Reeves filed an application for PCR, which the PCR court dismissed on February 3, 2011, after a hearing. Reeves filed a petition for a writ of certiorari, which this court granted on January 31, 2014. Reeves now requests that this court grant him post-conviction relief and vacate his convictions and sentences.

## STANDARD OF REVIEW

An appellate court must affirm the factual findings of the PCR court if they are supported by any probative evidence in the record. *Hyman v. State,* 397 S.C. 35, 42, 723 S.E.2d 375, 378 (2012). "However, reversal is appropriate where the PCR court's decision is controlled by an error of law." *Id.*

## LAW/ANALYSIS

Reeves argues his trial counsel was ineffective in failing to investigate and present the testimony of a gynecological expert witness. We agree.

Trial counsel must provide reasonably effective assistance under prevailing professional norms. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. To receive relief, the applicant must show (1) counsel was deficient and (2) counsel's deficiency caused prejudice. *Stalk v. State,* 383 S.C. 559, 560–61, 681 S.E.2d 592, 593 (2009). Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. 2052.

At the PCR hearing, Dr. Fredrick Morris Thompson, an expert in gynecology, testified on Reeves' behalf. Dr. Thompson testified injuries in the vaginal area do not necessarily heal quicker than any other area of the body. According to Dr. Thompson, there are multiple ways a trauma may occur in the vaginal area. He stated, "[S]ex is certainly not—or sexual play is not the only away [sic] the vagina can be injured." He explained injuries can occur through accidental injury, self-mutilation, or a fall. Further, Dr. Thompson opined that girls, more than boys, are given to masturbation, and in the course of masturbation, they could potentially injure themselves. However, he admitted there was no way to document what caused Victim's injury. He recalled he thought Dr. Bash

described Victim's injuries as a minor laceration near the opening of the vaginal area. When asked about Dr. Bash's ability to see a physical injury on Victim one month after the incident, Dr. Thompson stated,

> If it was a significant health-threatening injury, it probably would be fairly evident. If it was a minor laceration, a tear, it—you know, it could be in various stages of healing, and I know that there's [sic] ways of categorizing bruises to determine how long the bruise has been there. I don't think that was described in [Dr. Bash's] examination. A laceration would be very difficult to date, I think exactly, as to how long it had been there, and certainly difficult to say what exactly had caused that particular injury if there was not any other evidence of trauma.

As to Dr. Claiborne's testimony stating her findings were consistent with some kind of penetration even though the medical exam results were normal, Dr. Thompson stated, "I think it would be very difficult to make a statement as to could physical abuse [have] occurred or not if there were no signs to lead you to believe there was anything out of the ordinary." According to Dr. Thompson, the injury to Victim would have had to be fairly substantial in order to be seen a month after the injury. Further, when asked if an injury observed thirty days after the incident is something he would expect a person to seek medical attention for, Dr. Thompson responded,

> Again, you're given someone who may or may not have the expected degree of intelligence. There's a fear involved. There's all sorts of reasons why people fail to seek medical attention, but if your child was bleeding, I would think this would alarm them enough that they would probably want to go to a caregiver of some sort. Again, there's a lot of pain involved. Again, there would probably be some reaction.

However, he opined he would not expect to see the injury thirty days after the incident if it was a fairly minor laceration.

Trial counsel testified he received Reeves' case from his partner in 2002. He asserted the State made an offer of five years' probation, which Reeves declined because he was adamant he had not done anything wrong. Trial counsel maintained he no longer had his notes and file for this case because the file was destroyed, and he could not remember many

details about the case. Trial counsel admitted he did not consult with an expert prior to trial even though he knew the State would attempt to admit evidence of a physical trauma. When asked if a medical expert would have been helpful to counteract the State's expert witnesses, trial counsel explained,

> It might have, sir. As I remember, [Reeves] was making payments to my partner because he didn't have a lot of money at the time. I do not remember—I remember—I think I saw [Reeves], met with [Reeves] several times before we actually got ready for the trial. He had provided me with a witness list, a long list of people who, you know, would have helped him out. I do not remember whether he did that at my request or he just had it ready for me when I met with him. We decided to go that route. I started going down the list. If I'm correct, the entire defense was that [Victim's] mom had been convicted, [sic] against [Reeves] because [Reeves] had said, 'I don't like the lifestyle. You're not treating [Victim] well. I want you out of my house', if I remember correctly.

When asked again, trial counsel reiterated, "Sir, all I remember is there was a question about money. I know I never did talk to an expert, but whether [Reeves] and I talked about that, I cannot tell you."

The PCR court found Reeves failed to prove trial counsel was ineffective for failing to interview and present a medical expert at trial. The PCR court noted trial counsel testified he had not retained a medical expert because Reeves did not have the funds to do so. The PCR court stated, "A doctor could not state with certainty the exact cause of the injuries discovered and the determination of the cause of the injury was a question for the jury." Further, the PCR court stated, "Dr. Thompson's testimony did not make it any less likely that [Reeves] had committed the crime, in fact, the substance of his testimony at the PCR hearing only confirmed that the cause of the injuries was unclear." Accordingly, the PCR court denied and dismissed this ineffective assistance of counsel claim.

 "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." *Ard v. Catoe,* 372 S.C. 318, 331, 642 S.E.2d 590, 597 (2007) (emphasis omitted) (citation omitted). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. 2052. "[C]ounsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions[.]" *Id.* at 691, 104 S.Ct. 2052.

"[T]he United States Supreme Court has held that the defendant must have 'a fair opportunity to present his defense,' thereby requiring the State to provide the 'basic tools' for an adequate defense to an indigent defendant." *Bailey v. State,* 309 S.C. 455, 459, 424 S.E.2d 503, 506 (1992) (quoting *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)). "Thus, although the State is not required to provide the indigent defendant with unlimited funding, it must ensure that the defendant has competent counsel and the services of experts necessary to a meaningful defense[.]" *Id.*

South Carolina Code section 17–3–50(B) (2003) provides in pertinent part:

> Upon a finding in ex parte proceedings that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court shall authorize the defendant's attorney to obtain such services on behalf of the defendant and shall order the payment, from funds available to the Office of Indigent Defense, of fees and expenses not to exceed five hundred dollars as the court considers appropriate.

An applicant is only entitled to fees to pay for expert witnesses if the applicant shows a need for the expert testimony. *Thames v. State,* 325 S.C. 9, 11, 478 S.E.2d 682, 683 (1996). The mere possibility the applicant could find a witness

somewhere to support an allegation is insufficient to warrant authorization of funds. *Id.* Where counsel articulates a valid trial strategy for failing to call an expert witness to testify at trial, such conduct will not be deemed ineffective. *Legare v. State*, 333 S.C. 275, 281, 509 S.E.2d 472, 475 (1998).

In *Dempsey v. State*, the State called a therapist at the Low Country Children's Center to testify as an expert on child sexual abuse. 363 S.C. 365, 370, 610 S.E.2d 812, 815 (2005). The therapist opined the victim had been sexually abused. *Id.* In addition, the State presented expert testimony from a doctor who performed the victim's physical examination. *Id.* The doctor testified she found no physical evidence the victim was sexually abused, but it was likely that if someone was assaulted in the manner in which the victim alleged, there would be no physical evidence of the assault. *Id.* Dempsey's counsel did not call an expert to rebut the State's expert testimony because he believed the lack of physical evidence of abuse, by itself, was enough to rebut the State's expert testimony. *Id.* Our supreme court found Dempsey's counsel's decision not to call an expert witness to rebut the State's expert witness was a legitimate trial strategy. *Id.* Accordingly, the court held the PCR court erred in granting relief on the basis that trial counsel was ineffective in failing to call an expert witness on child sexual abuse. *Id.*

 In this case, we find trial counsel was deficient because he should have discussed hiring a medical expert with Reeves to more thoroughly challenge the State's medical evidence presented at trial. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Trial counsel admitted he did not consult with an expert prior to trial even though he knew the State would attempt to admit evidence of a physical trauma. Trial counsel recalled he failed to meet with an expert witness because "there was a question about money," but he also stated he could not recall whether he discussed this issue with Reeves at all.[5] Trial counsel could not recall much else about

---

5. If Reeves was indigent and could not afford to pay for an expert, the South Carolina Office of Indigent Defense could have provided the funds needed to secure an expert witness. *See* S.C.Code Ann. § 17-3-

the case or his trial strategy, and he no longer had his notes and file for this case because the file was destroyed. We also find trial counsel did not provide a legitimate trial strategy for failing to consult with an expert before trial or call a medical expert witness to testify at trial. *Contra Dempsey*, 363 S.C. at 370, 610 S.E.2d at 815 (finding a trial counsel's decision not to call an expert witness to rebut the state's expert witness was a legitimate trial strategy and holding the PCR court erred in granting relief on the basis that trial counsel was ineffective in failing to call an expert witness on child sexual abuse); *Legare*, 333 S.C. at 281, 509 S.E.2d at 475 (stating that where counsel articulates a valid trial strategy for failing to call an expert witness to testify at trial, such conduct will not be deemed ineffective); *Cherry v. State*, 300 S.C. 115, 117, 386 S.E.2d 624, 625 (1989) (providing an attorney's performance is not deficient if it is reasonable under professional norms).

█ We further find Reeves was prejudiced by his trial counsel's deficiency. *See Strickland*, 466 U.S. at 700, 104 S.Ct. 2052 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). Reeves presented evidence of prejudice through Dr. Thompson's testimony at the PCR hearing. Although Dr. Thompson admitted there was no way to document what was the cause of Victim's injury, he provided additional ways the injury could have occurred, including self-infliction or by accident. These additional theories were not presented during trial. In fact, the State, in its closing arguments, repeatedly argued, "There is no other explanation [for the injury] other than she was penetrated.... And that is a fact [the defense] cannot overcome .... that's undisputed testimony." Further, Dr. Thompson opined Victim's scars would have had to have been substantial to be seen one month after the incident. However, at trial, Dr. Bash's testimony does not indicate the injury was substantial.

50(B) (2003) ("Upon a finding in ex parte proceedings that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court shall authorize the defendant's attorney to obtain such services on behalf of the defendant and shall order the payment, from funds available to the Office of Indigent Defense, of fees and expenses....").

## CONCLUSION

Accordingly, we find the evidence does not support the PCR court's finding that Reeves failed to prove his counsel was ineffective. Further, we find counsel's ineffectiveness was prejudicial to Reeves.

**REVERSED.**

LOCKEMY and McDONALD, JJ., concur.